## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## BEAUFORT DIVISION

| | | |
|---|---|---|
| ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, | ) ) ) | |
| | ) | No. 9:13-cv-2852-DCN |
| Plaintiff, | ) ) | |
| vs. | ) ) | **ORDER** |
| GREGORY HOGAN, NORRIS SMART, and EDGAR LAMBERT, | ) ) ) | |
| Defendants. | ) ) ) | |

This matter is before the court on a motion for summary judgment brought by plaintiff Allstate Fire and Casualty Insurance Company ("Allstate"). For the reasons set forth below, the court grants Allstate's motion.

### I.   BACKGROUND

Allstate issued an automobile insurance policy ("the policy") to Sherry and Michael Eddings, effective from February 14, 2013 to August 14, 2013. Pl.'s Mot. Ex. H at 6. The policy listed a 2005 Chevy Colorado Truck ("the truck") as a "covered vehicle" and included Sherry Eddings's ("Sherry") 18-year-old son Jacob Canfield ("Canfield") as a driver of the truck. Id. at 6-8. Canfield received the truck as a Christmas present following his sixteenth birthday. Canfield Dep. 8:11-20. However, the truck was titled in his parents' names and Canfield was not a named insured under the policy. Pl.'s Mot. Ex. H at 6; Canfield Dep. 8:16-20. Sherry testifies that she explicitly told Canfield he was not allowed to lend the truck out to anybody. Sherry Aff. ¶¶ 6, 9, 11; Sherry Dep. 23:12-14, 42:10-43:4. Although it appears Canfield may have had a somewhat different understanding of Sherry's restrictions on his use of the truck, his deposition

1

testimony reflects that, at a minimum, he understood he was only allowed to loan the truck to licensed drivers.  Canfield Dep. 33:12-19

On March 20, 2013, at approximately 10:36 p.m., Canfield's friend and co-worker, defendant Edgar Lambert ("Lambert"), was driving the truck without a valid driver's license and got into an accident on Highway 278 in Bluffton, South Carolina.  Pl.'s Mot. Ex. A at 2; Lambert Dep. 43:6-9.  While driving under the influence of alcohol at a high rate of speed, Lambert sideswiped a vehicle driven by defendant Norris Smart ("Smart").  Pl's Mot. Ex. A at 2.  Due to the force of the impact, Smart's vehicle then struck the vehicle of defendant Gregory Hogan ("Hogan").  Id.  Lambert then crossed the median and oncoming lanes, turned 180 degrees and struck a tree on the opposite side of Highway 278.  Id.  After Lambert was transported to the Bluffton Police Department, he failed a breath analysis test by blowing a blood alcohol content level of 0.14.  Pl's Mot. Ex. B at 3.  Lambert was then taken to the Beaufort Law Enforcement Center and placed under arrest.  Id.  Lambert admits he drank alcohol during lunch that day and continued to drink throughout the afternoon at a house party.  Lambert Dep. 66:23-67:19.  Lambert also admits he purchased two bottles of liquor at a liquor store and took shots of liquor while driving the truck.  Id. at 67:10-19.

At the time of the accident, Michael Eddings lived in Georgia and was traveling for work in Russia and South Korea.  Sherry Dep. 11:14-18.  Sherry, Canfield, and Lambert lived on Daufuskie Island, South Carolina ("Daufuskie"), a small community that allows transportation by golf cart only.  Sherry Dep. 42:1-3; Lambert Dep. 7:20-24, 22:6-10.  Because residents cannot use cars on Daufuskie, Sherry and Canfield kept the truck parked on the "mainland" at Broad Creek Marina ("the marina") on Hilton Head Island.  Sherry Dep. 42:4-9; Lambert Dep. 22:6-10.

Sherry and Canfield were friendly with Lambert and his family and were both aware that Lambert did not have a driver's license. Sherry Dep. 23:16-19; Canfield Dep. 16:12-17:3.

Lambert recalls borrowing the truck from Canfield on one occasion before March 20, 2013. Lambert Dep. 57:4-17. On that occasion, Lambert assured Canfield a licensed driver would drive the truck. Id. at 17:18-25. Lambert drove the truck three blocks to his friend Angel's house, and then Angel, a licensed driver, took over driving the truck. Id. at 75:1-8. Canfield also recalls loaning the truck to Lambert one time prior to the accident. Canfield Dep. 18:4-14, 44:10-45:10. According to Canfield, Lambert asked to borrow the truck so he could go to Wal-Mart, and assured Canfield a licensed driver would drive the truck. Id. at 18:3-11, 44:23-25. Canfield's testimony is conflicting as to whether Angel or Simon, Lambert's brother, drove the truck on this occasion; both were licensed drivers. Id. at 18:4-14, 44:10-45:10.

Canfield and Lambert give different accounts of how Lambert came to drive the truck on March 20, 2013, and the restrictions put on Lambert's use of the truck. Lambert testified that he might have asked Canfield to borrow the truck on the night of March 19, 2013, and that he clearly remembers asking the next morning. Lambert Dep. 22:22-25. Canfield testified that, on the evening of March 19, 2013, Lambert asked if he could borrow the truck the next day so he could get a haircut on the mainland. Canfield Dep. 20:10-12. Canfield told Lambert he would first need to ask his mother for permission. Id. at 22:22-24. However, Sherry was out of town at the time on a hiking trip on the Appalachian Trail, and Canfield could not reach her. Id. at 20:18-19. Lambert testified that he did not know Sherry owned the truck until after the accident. Lambert Dep. 85:3-16.

Lambert testified that when he again asked to borrow the truck the morning of March 20, 2013, he told Canfield he needed to run errands, and Canfield handed him the keys without

3

restriction or instruction. Lambert Dep. 77: 20-23, 78:3-8. In contrast, Canfield testified he gave Lambert permission to use the truck within the following scope: (1) Lambert could go to the mainland to get a haircut and run errands; (2) Lambert would return from the mainland on the noon ferry; and (3) Lambert was required to have a licensed driver drive the truck, because Lambert did not have a valid driver's license. Canfield Dep. 20:8-9, 21:2-3, 7-11, 41:24-42:2, 45:6-22. Canfield further testified that Lambert told him Angel, a licensed driver and Lambert's friend, would be driving the truck at all times. Id. at 18:4-14, 45:11-25. Canfield acknowledges that he gave Lambert the keys to the Truck without his mother's permission. Id. at 23:5-7.

After Canfield gave Lambert the keys to the truck, Lambert left Daufuskie on the morning ferry to the mainland. Lambert Dep. 22:24-23:3. When Lambert did not return to Daufuskie on the noon ferry, Canfield grew worried and attempted to call Lambert several times. Canfield Dep. 46:17-47:5. He also sent Lambert a text message that stated: "My truck better be back at broad creek." Pl.'s Mot. Ex. J. Canfield then called Sherry and told her that Lambert had the keys to the truck. Canfield Dep. 26:11-18. Sherry immediately called Lambert after finding out he had the truck. Sherry Dep. 29:19-30:2. She testified Lambert answered her call and promised her he was not using the truck, was not driving the truck, and that the truck must be parked at the marina, because he did not have it. Id. at 30:12-15.

According to Canfield, Lambert called him after speaking with Sherry. Canfield Dep. 28:1-10. Lambert said that the truck was parked at the marina and that he would catch the 8:00 a.m. ferry the next morning. Id. at 28:5-14. Canfield instructed Lambert to make sure the truck was locked and safe at the marina, and told Lambert that he would retrieve the keys in the morning. Id. at 28:19-22.

4

Lambert testified he suffers from memory loss and therefore may not remember portions of what occurred on March 20, 2013. Lambert Dep. 21:2-3, 63:21-25, 64:9-10. Indeed, Lambert has no recollection of the telephone conversation with Sherry and testified he never told her that he was not using the truck. Id. at 31:9-10, 23-25. Furthermore, Lambert does not remember speaking with Canfield on the phone or receiving any text messages from him. Id. at 62:7-11. According to telephone records, Canfield called Lambert seven times and texted him one time on the afternoon of March 20, 2013, and Sherry called Lambert two times and texted him one time. Pl.'s Mot. Exs. I, J.

Lambert acknowledges that, at some point, Sherry texted him to make sure he would be returning the truck to the marina, but claims that she did not specify a time. Lambert Dep. 82:12-14. According to Lambert, he intended to get home on the 4:00 p.m. ferry, but he started drinking before that and threw "out what [his] plans were." Id. at 87:19-22. Eventually, he decided to spend the night at his friend Diana's house on Buck Island. Id. at 65:4-18. Lambert was driving the truck to Diana's house when he got into the accident. Id. at 65:16-18. Lambert admits that he drove the truck on March 20, 2013, and does not testify that he even saw Angel that day. Id. at 56:23-24.

On October 18, 2013, Allstate filed a declaratory judgment action to determine whether it has a duty to defend or indemnify Lambert against any claims that could arise from the accident. Lambert did not submit a responsive pleading to this action, but he testified by deposition.[1] Hogan, after receiving an extension, filed an answer on January 8, 2014. On August 20, 2014,

---

[1] On February 21, 2014, Allstate filed a motion for default judgment against Lambert and Smart. On June 13, 2014, Hogan filed a response. On June 20, 2014, the parties filed a motion for continuance on the hearing set for June 26, 2014 on Allstate's motion for default judgment. The parties requested the motion be heard in conjunction with Allstate's request for summary judgment, which had not yet been filed. Accordingly, this court then issued an order denying the motion for default judgment without prejudice on August 18, 2014. Allstate did not re-file the motion for default judgment.

5

Allstate filed this motion for summary judgment. On September 12, 2014, Hogan filed a response. Lambert and Smart did not respond to the motion. Hogan filed a supplemental response on October 30, 2014, to which Allstate filed a reply on November 7, 2014. The motion has been fully briefed and it is ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Id.</u> at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. <u>Id.</u> at 255.

## III.  DISCUSSION

Allstate argues that it has no duty to defend or indemnify Lambert because the named insured never gave Lambert permission to use or drive the truck as required by the express, clear terms of the policy. Pl.'s Mot. 12. Alternatively, Allstate contends that, to the extent Lambert

6

did have permission to use the truck, that permission was explicitly revoked prior to the accident. Id. at 15. Finally, Allstate asserts that Lambert's use of the truck at the time of the accident exceeded the scope of any permission arguably granted. Id. at 17.

As an initial matter, the terms of the policy adhere to the state statute construing omnibus coverage and do not broaden coverage in any way.[2] South Carolina law requires every automobile insurance policy to cover loss caused by an "insured." S.C. Code Ann. § 38-77-140 (2005). An "insured" includes the named insured, a resident spouse, resident relatives of either the named insured or spouse, permissive users, and guests in a vehicle to which the policy applies. Id. § 38-77-30(7). The party seeking to establish coverage through permissive use bears the burden of proving that the named insured gave permission. Liberty Mut. Ins. Co. v. Edwards, 364 S.E.2d 750, 751 (S.C. 1988) (citing Allstate Ins. Co. v. Federated Mut. Implement & Hardware Ins. Co., 161 S.E.2d 240 (S.C. 1968)).

South Carolina adheres to the "conversion" or "strict construction" rule of permissive use, which mandates coverage only if the permittee acted strictly within the scope of the permission granted. State Farm Mut. Auto. Ins. Co. v. Logan, 444 F. Supp. 2d 622, 626 (D.S.C. 2006); U.S. Fire Ins. Co. v. Macloskie, 465 S.E.2d 759, 763 (S.C. Ct. App. 1995). The conversion rule is the most stringent of the three possible standards that courts use for determining coverage in permissive use cases. See U.S. Fire Ins., 465 S.E.2d at 763. Even "minor deviations" from the scope of permission will result in no coverage under the conversion rule. Id.

---

[2] The policy defines insured persons, as: "1. While using your insured auto: a) you; b) any resident; and c) any other person using it with your permission." Pl.'s Mot. Ex. H (emphasis in original). Under the policy, "You or Your means the policyholder named on the Policy Declarations and that policyholder's resident spouse." Id. (emphasis in original).

7

Permissive use can result from either the express or implied permission of the named insured. S.C. Code Ann. § 38-77-30(7); Catawba Ins. Co. v. Smith, 518 S.E.2d 291, 293 (S.C. Ct. App. 1999). Regardless of whether permission is express or implied, "it must originate in the language or conduct of the named insured or of someone having authority to bind [him] in that respect." Rakestraw v. Allstate Ins. Co., 119 S.E.2d 746, 748 (S.C. 1961).

The court will now consider whether either express or implied permissive use applies in this case.

### A.     Express Permission

"Express consent 'must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference.'" Catawba Ins., 518 S.E.2d at 293 (quoting 8 Lee R. Russ & Thomas F. Segalia, Couch on Insurance § 112:37 (3d ed.1997)). As an initial matter, there is not a genuine issue as to whether Sherry, the named insured,[3] gave Lambert express permission to drive the Truck. There is no evidence, and Hogan does not claim, that Sherry gave Lambert permission to borrow the truck on March 20, 2013. Sherry's testimony is uncontradicted that she did not know of Lambert's use of the truck prior to that date.

Instead, Hogan's argument regarding permissive use rests on the "permission" Lambert received from Canfield. He argues that Canfield, as the "constructive owner" of the truck, made Lambert a permissive user when he expressly granted Lambert permission to use the truck. Hogan's Resp. 3-4. However, Hogan does not claim that Canfield was a named insured, and provides no authority which equates "constructive owner" with "named insured."

---

[3] Although Michael Eddings was also a named insured, Hogan's arguments for finding permissive use do not involve him. Hogan's Resp. 1. Neither party has provided any evidence that Michael Eddings's position as a named insured is relevant to this case. Accordingly, the court will discuss only Sherry's involvement as a named insured under the policy.

The South Carolina Supreme Court has addressed the idea of vehicle ownership in similar contexts, finding that ownership is not material to the question of insurance coverage. In State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co., a father was the named insured under the insurance policy on a vehicle primarily used by his son. 179 S.E.2d 203, 204 (S.C. 1971). Defendant argued that the son was the actual owner of the vehicle because he primarily drove the vehicle and he made payments on the vehicle. Id. at 205. However, the court emphasized that coverage "depended upon the consent, not of the owner but of the named insured . . . ." Id.

Similarly, in Keeler v. Allstate Ins. Co., a father was the named insured under the insurance policy on a vehicle that his son purchased and used without restriction. 198 S.E.2d 793, 795 (S.C. 1973). The son lent the vehicle to a third party who then injured the plaintiff in a car accident. Id. at 794. The court quoted State Farm v. Allstate to refute the argument that the son, as the owner of the vehicle, held "the equivalent position of a named insured" under the insurance policy. Id. at 796. In Keeler, as in State Farm v. Allstate, the court found insurance coverage "depended upon the consent, not of the owner but of the named insured . . . ." Id.

In light of State Farm v. Allstate and Keeler, Canfield's alleged position as the "constructive owner" of the truck is immaterial to the question of insurance coverage. Rather, the proper inquiry is whether Lambert received permission from Sherry, the named insured. As previously explained, Hogan has failed to present any evidence that Sherry, the named insured, gave Lambert express permission.

**B.     Implied Permission**

Hogan next argues that Lambert had implied permission to use the truck. He essentially argues that Sherry, in gifting the truck to Canfield, gave Canfield the authority to lend the truck

9

to third parties.  Hogan's Supplemental Resp. 3.  Hogan contends that Lambert had implied permission to use the truck on March 20, 2013 by virtue of this authority.  Id.

"'Implied consent, as the term suggests, rests upon proof of circumstances from which an inference of actual permission or consent reasonably arises.'"  Catawba Ins., 518 S.E.2d at 293 (quoting Cooper v. Firemen's Fund Ins. Co., 167 S.E.2d 745, 747 (S.C. 1969)).  "Implied consent involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent."  Keeler, 198 S.E.2d at 795.  "[I]mplied permission cannot arise when the use of the vehicle is directly contrary to the named insured's express instructions."  Progressive Specialty Ins. Co. v. Murray, 472 F. Supp. 2d 732, 737 (D.S.C. 2007).  Nor can implied consent arise simply because the named insured allowed another to use the vehicle on prior occasions.  See Catawba, 518 S.E.2d at 293-94.  Permission to use a vehicle for a specific purpose does not imply permission to use the vehicle for all purposes.  Crenshaw v. Harleysville Mut. Cas. Co., 144 S.E.2d 810, 812 (S.C. 1965).  Finally, the consent required for implied permission "must flow from the insured or one authorized to act on his behalf."  S. Farm Bureau Cas. Ins. Co. v. Hartford Accident & Indem. Co., 179 S.E.2d 454, 457 (S.C. 1971).

To demonstrate coverage, Hogan must first establish that Lambert was a "permissive user" as defined in S.C. Code Ann. § 38-77-30(7).  Hogan has not presented any evidence that Sherry gave Lambert express permission to borrow the truck.  Therefore, to survive summary judgment, Hogan must present a genuine issue as to whether Sherry gave implied permission.

The evidence indicates, without contradiction, that Sherry, as the named insured, restricted Canfield's authority to loan the truck to others.  Sherry testified in her affidavit and deposition that she explicitly told Canfield he did not have permission to allow anyone else to

10

borrow the truck. Sherry Aff. ¶¶ 6, 9, 11; Sherry Dep. 23:12-14, 24:18-22, 42:10-43:4. Canfield's deposition testimony reflects that, at a minimum, he understood he was not allowed to loan the truck to unlicensed drivers. Canfield Dep. 33:12-19. He testified in his deposition as follows:

> Q: In your interview with Ms. Granville, you stressed that your mother [Sherry] said, "Make sure it's a licensed driver if anybody borrows your car?"
> A: Yes.
> Q: Is that the way you understood your mother's instructions to you regarding other people using the vehicle?
> A: Yes.

Id.

Even viewed in the light most favorable to Hogan, Sherry limited Canfield's authority to loan the truck only to licensed drivers. Canfield testified that when he allowed Lambert to borrow the truck on March 20, 2013, he believed Lambert would have a licensed driver, Angel, drive the truck. Canfield Dep. 21:7-11, 45:11-21. Despite Canfield's expectations, Lambert drove the truck that day and caused the accident while drinking and driving that night. Lambert Dep. 56:23-24; Pl.'s Mot. Ex. A at 2. There is no question that Lambert's use of the truck was directly contrary to Sherry's instructions that only licensed drivers could borrow the truck. Canfield Dep. 33:12-19.

South Carolina case law precludes a finding of permissive use under these facts. See, e.g., Murray, 472 F. Supp. 2d at 737 ("Certainly implied permission cannot arise when the use of the vehicle is directly contrary to the named insured's express instructions."); Keeler, 198 S.E.2d at 795 (finding permissive use did not exist where initial permittee allowed third party to drive the vehicle "contrary to a specific prohibition by [named insured]"); Dearybury v. N.H. Ins. Co., 179 S.E.2d 206 (S.C. 1971) (finding permissive use did not exist where daughter of named insured gave third party permission to drive vehicle in direct violation of named insured's

11

instructions); State Farm v. Allstate, 179 S.E.2d at 204 (finding neither express nor implied consent existed where named insured expressly prohibited his son from lending the vehicle out to friends, and the son's friend drove the vehicle in violation of this rule).

There is no evidence that Lambert's use of the truck was within any express or implied permission established by Sherry. Therefore, Hogan's arguments that Lambert was a permissive user fail as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS** Allstate's motion for summary judgment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**December 1, 2014**
**Charleston, South Carolina**